Terry WEST, individually and as
guardian of T.W., and T.W.,
a minor, Plaintiffs,

v.

DERBY UNIFIED SCHOOL DISTRICT
# 260, Defendant.

No. 98–1163–WEB.

United States District Court,
D. Kansas.

Aug. 11, 1998.

: Jason M. Sneed, Lathrop & Gage L.C., Overland Park, KS, for Terry West, plaintiff.

M. Kathryn Webb, Shari Renee Lyne Willis, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, Jeff L. Griffith, Jerry L. Griffith, Griffith & Griffith, Derby, KS, for Unified School District 260, defendant.

William P. Tretbar, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Wichita Eagle and Beacon Publishing Company, Julie Mah, movants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff T.W., a minor student attending the Derby Middle School, was suspended from school for three days after he drew a picture of a Confederate flag on a piece of paper during his math class. The defendant Derby Unified School District # 260 suspended T.W. because it found he had violated the district's "Racial Harassment or Intimidation" policy, which prohibits students from possessing at school "any written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred," and which includes as examples of prohibited items "any item that denotes ... Confederate flags or articles." On July 21, 1998, the court heard evidence on T.W.'s claim that the School District violated his First Amendment rights. Having heard the evidence presented, the court is now prepared to rule and makes the following findings of fact, as shown by a preponderance of the evidence, and conclusions of law.

#### I.

Plaintiff T.W. is a minor residing in Derby, Kansas. Plaintiff Terry West is T.W.'s father. During the 1997–98 academic year, T.W. was a seventh-grade student at the Derby Middle School. T.W. plans to be an eighth-grade student at the middle school in the 1998–99 school year. Defendant Derby Unified School District # 260, which is responsible for operating the Derby Middle School, is a school district of the State of Kansas located in Sedgwick County.

As Derby's population grew and became more diverse in the 1990's, the Derby School District experienced an increase in racial incidents involving students. The incidents occurred primarily at the Derby High School. In early 1995, there were several verbal confrontations at the high school between groups of white and black students. Although some of the confrontations were hostile and were viewed by administrators as potentially violent, apparently none of the confrontations at the school escalated to the point of fighting.

During 1995, some white students at the high school wore shirts bearing images of the Confederate battle flag. At the same time, some African–American students wore shirts with an "X" denoting support for the teachings of Malcolm X. In response, some white students wore shirts that stated, "You wear your X and I'll wear mine" with a Confederate flag representing the "X" on the back of the shirt. These types of displays provoked hostility between white and black students. A former Derby High School student, Stephanie Hart, described an incident she witnessed in 1995 in which a white student wearing a Confederate flag shirt said to a black student wearing a Malcolm X shirt, "Nice shirt, nigger." Ms. Hart testified that the Confederate flag came to be regarded by many students at Derby High as a symbol of racism.

In 1995, members of the "Aryan Nation" gathered just outside the entrance to the Derby High School and, in an attempt to solicit new members, passed out printed material to students as they left the school. The Ku Klux Klan also circulated printed materials off campus that students brought to school to distribute. The materials were passed around school by some students. Examples of the views found in these materials include: "When a White person copulates with a non-white their children will be non-white. If this race mixing trend continues it will only be a matter of time until America sinks into a monkey jungle of mixed races"; "Martin Luther King Jr.'s so-called dream has become a nightmare for the White Race and will continue to get worse and will eventually destroy the White Race ... We believe that a total geographical separation and repatriation of all non-white races from

America is the only solution...."; and "As far as religion goes we believe the only thing jews worship is money, and power." Some of the materials contained images of the Confederate flag together with other symbols. Students advocating white supremacy distributed applications for membership to the White Knights of the Ku Klux Klan at the school and handed out KKK "business cards." One class at Derby High School was disrupted after a teacher confiscated some of this material from a student in the classroom.

Around this time, school officials at the Derby High School and Middle School began seeing racial graffiti in bathrooms and on walls saying "KKK" and "KKKK" (the latter standing for "Ku Klux Klan Killer"). Additionally, students spray painted walls or sidewalks at the high school football stadium, which is located on the middle school grounds, with such things as "KKK" and "Die Nigger."

School officials received reports of racial incidents occurring on school buses used to transport students from all schools in the district. The Derby Middle School parking lot serves as a "bus terminal" where busloads of students from all grade levels are brought to transfer to other buses to be transported to their schools.

School officials also received reports of racial episodes at Derby High School football games, including one incident where a fight broke out because a student wore a Confederate flag headband.

Brad Keirns, the Assistant Principal of the Derby Middle School, testified at trial that he had seen instances of racial harassment in the middle school and that such incidents had a negative effect on minority students. Keirns said that some of the incidents involved the Confederate flag, including one where a student at school had a KKK or Aryan Nation card with a Confederate flag and other instances where students had drawn the Confederate flag on notebooks or on their arms. Keirns said that such incidents had heightened tension among students of different races and that the situation was potentially violent.

Although these incidents were not widespread and involved a relatively small number of students, there was significant concern among school officials and members of the Derby community in 1995 about the need to do something to address and to prevent racial problems of the type that were occurring in the district. In February of 1995, Derby School District administrators sent a letter to all parents of Derby High School students inviting all interested citizens to attend a February 6, 1995, public meeting at the High School to discuss these problems. About 300 interested parents, students, citizens and community leaders attended the meeting. School officials compiled a list of concerns and solutions that were offered by focus groups at the meeting. The Derby School District then organized a 350–member task force to address racial issues in the district. That group, known as the Racial and Social Equity Task Force, issued its recommendations in June of 1995. One such recommendation, which was subsequently adopted, was that the Board of Education should develop a racial harassment policy modeled after the district's smoking and sexual harassment policies. The task force also recommended that a strong penalty be imposed for violation of the policy.

The Board of Education met in June of 1995 and adopted a new Racial Harassment or Intimidation Policy to be incorporated into all student handbooks for kindergarten through twelfth grade that read as follows:

RACIAL HARASSMENT OR INTIMIDATION

Student(s) shall not racially harass or intimidate another student(s) by name calling, using racial or derogatory slurs, wearing or possessing items depicting or implying racial hatred or prejudice. Students shall not at school, on school property or at school activities wear or have in their possession any written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred. (Examples: clothing, articles, material, publications or any item that denotes Ku Klux Klan, Aryan Nation— White Supremacy, Black Power, Confederate flags or articles, Neo–Nazi or any other "hate" group. This list is not intended to be all inclusive.)

Violations of this policy shall result in disciplinary action by school authorities. There will be a three day out-of-school suspension for the first offense with a required parent conference prior to readmittance. The second offense will result in a three to five day out-of-school suspension with a possible expulsion hearing. The third offense will result in a suspension from school pending an expulsion hearing. Any student who believes he or she has been subjected to racial harassment should discuss the problem with his/her principal, or another certified staff member. Initiation of a racial harassment complaint will not cause any adverse reflection of the student. The initiation of a student's complaint shall not adversely affect the job security or status of any employee or student until a finding of fact determines that improper conduct occurred. Strict confidentiality shall be maintained throughout the complaint procedure. (Policy subject to change based upon change in district policy.)

Although most of the racial problems in 1995 had occurred at the Derby High School, the district determined that the racial harassment policy should be applied at all levels, including the Derby Middle School. There were several reasons for this, including the fact that racial problems had occurred in and around the middle school, that middle school students frequently came into contact with high school students, that administrators and parents believed such a policy for younger students would help prevent racial problems before they started, that a uniform policy was desirable from the standpoint of fairness and would enhance student understanding of the boundaries of appropriate behavior, and the ease and consistency of administration resulting from a single policy.

The Racial Harassment or Intimidation policy reflected the cumulative efforts and input of school administrators, the Racial and Social Equity Task Force, and the other individuals and groups that became involved at the invitation of the district.

The Office of Civil Rights ("OCR") of the United States Department of Education subsequently notified USD 260 that it would be

conducting a review to determine if the district was complying with federal requirements that prohibit recipients of federal funds from discriminating on the basis of race, color, or national origin. The focus of the review was on whether the district's disciplinary policies and practices were administered in a nondiscriminatory manner and whether procedures were in place to prevent and remedy racial harassment. In June of 1996, the district agreed to adopt certain recommendations of OCR concerning discipline and the district's racial harassment policy.[1] One such recommendation was that the district reduce discretion in the administration of disciplinary sanctions. In December of 1997, the OCR determined that no further action was required and that the district had fully implemented its agreement.

The policies and procedures implemented by USD 260 have been effective and have resulted in a marked decline of incidents of racial harassment or discord. Administrators of USD 260 believe that the racial harassment policy has helped to reduce racial tensions between students in the district. The number of referrals in the middle school dealing with racial problems in the last two years are significantly lower than the number observed in 1996.

All middle school students in the district were required to review Student Handbooks that set forth the policies of the school, including the Racial Harassment or Intimidation policy. In August of 1997, T.W. signed an acknowledgment form stating, "I have reviewed and understand the disciplinary policy at DMS as outlined in the DMS agenda book."

The Handbooks for the 1997–98 year also contained a "Parents' Page" with an acknowledgment form for parents stating, "I have read and discussed the parent/student handbook with my child. I understand that any questions I have should be addressed to Derby Middle School Administrators. I understand that the rules and procedures in this handbook are for the purpose of promoting and safe [sic] and orderly environment in which my child can learn and succeed." The form contains a space for a parent signature. At the top it indicates that the form should be removed from the book and returned to a teacher. Terry West, T.W.'s father, testified that he never looked at the Student Handbook prior to T.W.'s suspension for drawing a Confederate flag.

During the first couple of days of the 1997–98 school year, teachers at the Derby Middle School reviewed the policies in the Student Handbook with the students. They read portions of the handbook to students, including the policy on Racial Harassment or Intimidation. T.W. was present when the policy was reviewed.

Prior to April of 1998, T.W. was involved in numerous prior disciplinary incidents during the 1997–98 school year.

On or about November 6, 1995, T.W. received a short-term suspension, from November 6 to November 8, 1995, for directing a racial slur ("blackie") to another student.

On or about February 13, 1998, T.W. received an administrative conference after another student accused him of saying, "What's up, nigger?" to him. The other student was white. T.W. denied making the statement, and school officials were unable to find witnesses to this statement. T.W. received an administrative conference with Derby Middle School Assistant Principal Brad Keirns, who reviewed the Racial Harassment or Intimidation policy with T.W., including the examples of items prohibited by the policy such as Confederate flags.

On April 14, 1998, T.W. was present in his mathematics class at Derby Middle School. He was seated at his desk, which was grouped together with the desks of three other students, when he and one of the other students in the group, D.H., began talking about the "Rebel Flag." T.W. knew how to draw the Confederate flag because he had previously seen it on car license plate holders, on a flag at the "Four Flags Trading Post" in Wichita, on the television show

"Dukes of Hazzard," and on a race car he had seen at the "81 Speedway" race track.

It is undisputed that after some discussion between the students, T.W. drew a picture of a Confederate flag on the back of a piece of paper and that D.H. gave the drawing to Mr. Koehn, the boys' math teacher, and told him that T.W. had drawn it. After Mr. Koehn saw the drawing, he instructed T.W. to sit out in the hallway. T.W. sat in the hall for approximately twenty minutes until the period ended. When class ended, and because math was his last class of the day, T.W. collected his belongings from his locker and left the school. The next morning, April 15, 1998, Mr. Koehn gave the Confederate flag drawing to Assistant Principal Brad Keirns and told him that T.W. had drawn the picture the previous day in math class. T.W. arrived late to school on April 15 and proceeded to the office to sign in. He was told that Mr. Keirns wanted to see him in his office.

Mr. Keirns has been the 7th Grade Assistant Principal at Derby Middle School for four years. He is responsible for meting out discipline to 7th graders and for enforcing the district's policies governing student behavior.

When T.W. went to Mr. Keirns' office on April 15, 1998, Keirns showed him the picture of the Confederate flag and asked T.W. if he recognized it. T.W. said yes and acknowledged that he had drawn the picture. Keirns then reviewed the Racial Harassment or Intimidation policy with T.W. and asked him if he understood that under the policy he was not supposed to possess a Confederate flag. T.W. said yes and acknowledged that he knew he had drawn a Confederate flag. Keirns indicated that he believed T.W. had violated the Racial Harassment policy, and he asked T.W. if he wanted to write a statement setting forth his version of the incident. T.W. initially declined, but did write a statement after Keirns again asked him to do so.

Mr. Keirns initially obtained written statements from two of the students who had been sitting in math class with T.W.[2] Both of these students indicated in written statements that T.W. was warned by them before

he drew the flag that he would get in trouble for doing so. One of them wrote that all three students around T.W. warned him that he would get suspended for drawing the rebel flag and that T.W. "said he didn't care and drew it anyway."

Based on the information he had gathered, Mr. Keirns concluded that T.W. had violated the Racial Harassment or Intimidation policy and that a three day suspension was warranted. Mr. Keirns was firmly convinced that T.W. knew that what he was doing was wrong and that he had intentionally violated the racial harassment policy. At the same time, Keirns did not believe, and there was no evidence to suggest, that T.W. planned to use the flag to harass or intimidate anyone. According to Mr. Keirns, the factors that went into his decision to suspend T.W. were that T.W. admitted to making the drawing, that other students saw the drawing, that other students had warned T.W. not to make the drawing, and that Mr. Keirns had reviewed the Racial Harassment or Intimidation policy with T.W. following a previous incident.

■ Contrary to plaintiff's suggestion that he did nothing more than possess the drawing of the Confederate flag, the court finds that T.W. drew the flag with an intention of displaying it to another student, and that he in fact did so. The court further finds it likely that at least three of the students around T.W. in his math class saw the drawing.

Keirns called Terry West on the telephone and informed him that T.W. was suspended for drawing a Confederate flag in school. Mr. West expressed disbelief to Mr. Keirns, and specifically asked if T.W. had used the drawing to harass or intimidate any other student. Mr. Keirns stated that T.W. had not.

The day that T.W. was suspended, Terry West contacted the local newspaper about the incident.

T.W. testified at trial as to the circumstances surrounding his drawing of the flag.

2. Mr. Keirns subsequently obtained the written statement of a third student who had witnessed the incident. The statement of that student corroborated Mr. Keirns's prior conclusion that T.W. knew he was violating the policy.

To put it charitably, the court finds that T.W. demonstrated a "convenient memory" when he recounted those events. T.W. attempted—as some adolescents in such a situation are inclined to do—to minimize any evidence that he knew his actions were wrong. He claimed that he hadn't read the Student Handbook before the incident, despite the fact that he had signed an acknowledgment form stating that he had. He professed little recollection of Mr. Keirns having reviewed the racial harassment policy with him after the February 1998 incident, conceding only that Keirns "might have" done so. He suggested that he was only vaguely aware of the prohibition on possession of items denoting Confederate flags, despite the fact that school officials had reviewed the policy with him on more than one occasion. He conceded that he initially refused to draw the flag when D.H. first asked him to, but asserted that this was because he was trying to do his math assignment and not because he thought he would get in trouble. And, although he conceded that the three students around him had no reason to lie about him, he said that he did not hear any of them warn him that he would get in trouble if he drew the flag. He further denied having said "I don't care" in response to one of the student's warnings that he would get suspended.

As was stated above, Mr. Keirns concluded that T.W. intentionally violated the racial harassment policy when he drew the Confederate flag. That finding is amply supported by the evidence. The Racial Harassment policy had been read to T.W. on more than one occasion, including a one-on-one session with Mr. Keirns. The written statements of the other students who witnessed the incident make clear that T.W. was warned before he drew the flag that he would get suspended for it. Those statements also make clear that T.W. drew the flag with a willful purpose to disobey or to disregard the rule prohibiting such a drawing. The evidence suggests that T.W. initially refused to draw the flag because he knew he could get in trouble, that he was well aware that such a drawing could be considered improper under the school's policy, that he was warned by more than one student around him that he would get suspended if

he drew the flag, that he responded by saying "I don't care," and that when D.H. began walking to the teacher to show him the drawing, T.W. said "come back" because he knew he would get in trouble. The intimation that T.W. acted innocently and without any improper purpose is contrary to the evidence. While T.W. may not have intended to harass anyone by drawing the Confederate flag, it is clear to the court that he knowingly and intentionally violated the policy against possession of such symbols at school.

The plaintiff suggests that the court should not consider as evidence the written statements of the other students who witnessed the incident because those statements were not given under oath and because the students were not called as witnesses at trial. The court rejects this argument. As an initial matter, the court finds it was entirely appropriate for Mr. Keirns to have relied on such statements in support of his decision to suspend T.W. School administrators "are entitled to rely on traditional sources for the factual information on which they decide and act." *Wood v. Strickland,* 420 U.S. 308, 319, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In such circumstances an administrator has "an obvious need for prompt action, and decisions must be made in reliance on factual information supplied by others." *Id.* Given the factual basis Mr. Keirns had to support his decision, he was entitled to rely on such statements, and the court has no basis in this action to question such reliance. *Cf. Wood,* 420 U.S. at 326, 95 S.Ct. 992 (§ 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings). Moreover, the court concludes that such statements are admissible and are properly considered under one of the numerous exceptions to the rule against hearsay. *See e.g.,* Fed.R.Evid. 803(6) & (8), 807.

Mr. Keirns presented T.W. with a written Notification of Short–Term Suspension on the morning of April 15th which included the basis for and the length of the suspension. T.W. signed the document in Mr. Keirns' presence.

Melva Owens was the Superintendent of USD 260 when the district adopted its Racial

Harassment or Intimidation policy. She testified at trial about the circumstances that led to adoption of the policy and she gave her understanding of how the policy is supposed to be applied. According to Ms. Owens, the policy permits an administrator to consider a number of factors in determining whether a violation has occurred, including the student's state of mind at the time (whether intentional or innocent) and whether the incident promotes hatred. Brad Keirns also testified that the circumstances surrounding each incident are considered in determining whether a violation of the Racial Harassment or Intimidation policy has occurred. He said that he is expected to use common sense in applying the policy. For example, he said, students are not punished for possessing books containing pictures of Confederate flags. Keirns suggested that students would not be punished for possession of Confederate flag images in connection with any legitimate educational purposes, noting that a student who had previously included swastikas on a model project relating to study of the Holocaust did not violate the policy. According to Keirns, a student's intent is considered in deciding whether a violation has occurred, and if it is determined that a student did not mean to do anything wrong, that student would not be punished.

The district requires all 8th Grade students to possess as part of the history curriculum a book entitled, "The American Journey," which depicts the Confederate flag on several pages. Also, library books that contain depictions of the Confederate flag are made available to students at the Middle School. Students are not punished for having these materials in their possession.

In the summer of 1998, the district hosted a national student conference at Derby High School. As part of that conference, the district displayed the state flags of all fifty states, including those of Mississippi and Georgia, whose flags include depictions of the Confederate flag.

Terry West testified that various kids have called T.W. a racist because of what happened and that some kids physically confronted T.W. on one occasion. Mr. Keirns testified that the district had some concerns for T.W.'s safety after the flag incident. He testified that three students were upset that

T.W. drew the flag, and Keirns called these students in and talked to them.

Dr. Dennis Shoemaker, the current Superintendent of USD # 260, believes that the Racial Harassment or Intimidation policy has been effective in reducing racial tension among students in the district. He is concerned about problems that would result if the prohibition on possession of Confederate flag images were to be voided. He believes that the Confederate flag is widely regarded in the district as a symbol of racial prejudice and believes there would be retaliation if some students were permitted to display it at school.

## II.

■ The First Amendment to the United States Constitution provides in part that "Congress shall make no law ... abridging the freedom of speech, ..." The amendment applies to the States by virtue of the Fourteenth Amendment. *See e.g., Board of Ed., Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 855, n. 1, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). As an agency of the State of Kansas, Derby USD 260 is subject to the limitations of the First Amendment.

■ The First Amendment guarantees wide freedom in matters of adult public discourse. *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). It does not follow, however, that the same latitude must be permitted to children in a public school. *Id.* The Supreme Court has recognized on several occasions that the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings. *Id. (citing New Jersey v. T.L.O.,* 469 U.S. 325, 340–42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)).

Two Supreme Court cases in particular address this qualification. In *Tinker v. Des Moines Indep. Comm. School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Supreme Court found that a school violated the free speech rights of students by suspending them for wearing black armbands to school to protest the Vietnam war. Although

the school argued that it feared the students' actions would cause a disruption, the Supreme Court said that this was an "undifferentiated fear," and that the prohibition could not be sustained absent a showing that the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the school." *Id.* at 509, 89 S.Ct. 733. Moreover, the Court noted, the school did not prohibit the wearing of other political symbols, and an attempt to single out and suppress one particular opinion was not constitutionally permissible. *Id.* at 511, 89 S.Ct. 733. On the other hand, the Court said, conduct by a student which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is not immunized by the constitutional guarantee of freedom of speech. *Id.* at 513, 89 S.Ct. 733. More recently, in *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Court upheld a public high school's suspension of a student for giving a speech containing sexual innuendo at a school assembly. In doing so the Court found that the fundamental role of public schools in preparing students for citizenship in a democracy included teaching students the "habits and manners of civility," *id.* at 681, 106 S.Ct. 3159, and explained:

> These fundamental values of "habits and manners of civility" essential to a democratic society must, of course, include tolerance of divergent political and religious views, even when the views expressed may be unpopular. But these "fundamental values" must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior. Even the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences.

*Id.* at 681, 106 S.Ct. 3159. In finding that the school could punish the student for using offensive language, the Court said that "[n]othing in the Constitution prohibits the states from insisting that certain modes of expression [in public schools] are inappropriate and subject to sanctions." *Id.* at 683, 106 S.Ct. 3159. Moreover, "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Id.* "The First Amendment," the Court concluded, "does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission." *Id.* at 685, 106 S.Ct. 3159.

■ With this background in mind, the court turns to the Derby School District's policy that prohibits students from possessing "written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred," and which includes by way of example "clothing, articles, material, publications or any item that denotes ... Confederate flags or articles." The court concludes that, unlike the *Tinker* case, school officials in Derby had evidence from which they could reasonably conclude that possession and display of Confederate flag images, when unconnected with any legitimate educational purpose, would likely lead to a material and substantial disruption of school discipline. The district experienced a series of racial incidents or confrontations in 1995, some of which were related to display of the Confederate flag. The incidents included a hostile confrontation between a group of white and black students at school and at least one fight at a high school football game. *Cf. Tinker*, 393 U.S. at 508, 89 S.Ct. 733 (this case "does not concern aggressive, disruptive action or even group demonstration."). The Racial Harassment policy enacted in response to this situation was clearly "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *See Id.*, 393 U.S. at 509, 89 S.Ct. 733. The history of racial tension in the district made administrators' and parents' concerns about future substantial disruptions from possession of Confederate flag symbols at school reasonable. The fact that a full-fledged brawl had not yet broken out over the Confederate flag does not mean that the district

was required to sit and wait for one. "[I]f there are substantial facts which reasonably support a forecast of likely disruption, the judgment of the school authorities in denying permission and in exercising restraint will normally be sustained." *Phillips v. Anderson County School Dist. Five*, 987 F.Supp. 488, 492 (D.S.C.1997). In this case, the district had a reasonable basis for forecasting disruption from display of such items at school, and its prohibition was therefore permissible under the *Tinker* standard. The fact that T.W.'s conduct may not have resulted in an actual disruption of the classroom on April 14, 1998, does not mean that the school had no authority to act. *See Phillips*, 987 F.Supp. at 493 ("One day free of conflict does not eliminate the school's significant history of problems caused by the Confederate Flag. Nor does it support a conclusion that the Confederate Flag would no longer cause disruptions at [the school] or that [the school] should have waited until the Confederate Flag caused yet another disruption...."). The district had the power to act to prevent problems before they occurred; it was not limited to prohibiting and punishing conduct only after it caused a disturbance.

In connection with the above finding, the court makes a brief comment on the nature of the Confederate flag. Plaintiff correctly points out that this flag is vilified by some, but honored by others. The court does not mean to suggest in this opinion that anyone who displays this flag is a racist or that they necessarily do so to express any particular viewpoint on race. Moreover, outside of the school context, it is certainly the right of any American to display any symbol they wish, and it is not the place of this court to approve or disapprove of such behavior. But the court can and will say that in the context of this case, the school district had a reasonable basis for concluding that the Confederate flag is a symbol that "is racially divisive or creates ill will or hatred." One of the most unfortunate aspects of this case is T.W.'s explanation after he drew the flag that he "didn't know what it ment [sic]." Whether he knew it or not, it is a fact that the Confederate flag was adopted by those in America whose purpose was to preserve a system that permitted the enslavement of African–Americans. To many who are aware of the immeasurable human suffering that resulted from slavery and the Civil War, displaying this flag today represents an expression of continuing contempt for the rights of African–Americans to participate fully and equally in American society. It is certainly possible to display the Confederate flag without any such thought in mind, and there is no evidence that T.W. intended to make such a statement or, indeed, that he intended to express any particular viewpoint at all. But given the Confederate flag's history, as well as the history of racial incidents in the Derby School District, it was reasonable for the district to consider this flag as a symbol whose display at school would likely lead to a disruption. In this regard, it should be noted that other courts have also held that the First Amendment does not prevent schools that have experienced disruptive racial problems from prohibiting the display of Confederate flag symbols. *See Melton v. Young*, 465 F.2d 1332 (6th Cir.1972), *cert. denied*, 411 U.S. 951, 93 S.Ct. 1926, 36 L.Ed.2d 414; *Phillips v. Anderson County School Dist. Five*, 987 F.Supp. 488 (D.S.C. 1997); and *Denno v. School Board of Volusia County*, 959 F.Supp. 1481 (M.D.Fla.1997) (school official was immune from damages for suspending student who wore Confederate flag symbol). *Cf.* "The Banning of Confederate Symbols in the Public Schools," 125 Ed. Law Rep. 1019 (West 1998).

■ The court also finds that the school district's policy is supported by the reasoning of *Bethel School District*. The "habits and manners of civility" which the Supreme Court said are essential to a democratic society "must take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Bethel School Dist.*, 478 U.S. at 682, 106 S.Ct. 3159. Part of a public school's essential mission must be to teach students of differing races, creeds and colors to engage each other in civil terms rather than in "terms of debate highly offensive or highly threatening to others." *See id.* at 683, 106

S.Ct. 3159. There is no evidence that the school district has attempted to suppress civil debate on racial matters, but the district has concluded that the display of certain symbols that have become associated with racial prejudice are so likely to provoke feelings of hatred and ill will in others that they are inappropriate in the school context. There is evidence in the district's recent past to support such a view, and the court concludes that the district's prohibition of those symbols and its insistence upon more civil terms of debate is within its lawful authority. *Cf. Bethel,* 478 U.S. at 683, 106 S.Ct. 3159 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate rests with the school board.").

### III.

■ Aside from arguing that the district's Racial Harassment or Intimidation policy fails under the standards of *Tinker* and *Bethel,* plaintiff also argues that the policy is unconstitutionally overbroad on its face. An overbroad statute is one that is designed to punish activities that are not constitutionally protected, but which prohibits protected activities as well.[3] Plaintiff argues that the policy is overbroad because it penalizes students for engaging in speech or expression that does not materially interfere with school discipline, because it punishes them for possessing symbols even if the student does not intend to harass anyone and even if no one is harassed, and because the list of prohibited symbols in the policy is "not intended to be all inclusive."

■ Only a statute that is substantially overbroad may be invalidated on its face. *City of Houston v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). The Supreme Court has never held that a statute should be invalidated merely because it is possible to conceive of a single impermissible application. *Id.* Instead, in a facial challenge

to the overbreadth and vagueness of a law, the court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. *Id.*

■ In discerning the reach of the policy, the court must consider any limiting constructions placed on the policy by the defendant. *See Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Administrative interpretation and implementation of a regulation are ... highly relevant to" whether the regulation is overbroad.) In this regard, the court notes that the district has asserted that administrators are entitled to consider "common sense" in enforcing the policy, and that Mr. Keirns' testimony shows he considered certain factors not listed in the policy in determining that T.W. should be suspended. For example, he relied on the fact that T.W. intentionally violated the policy, that T.W. displayed the Confederate flag drawing to another student, that other students saw the drawing, and that other students had warned T.W. not to draw the flag. Mr. Keirns' testimony also made clear that possessing depictions of the Confederate flag for legitimate educational purposes, such as in history or library books, is not considered by the school to be a violation of the policy and that no student has ever been disciplined for such conduct.

■ Absent the limitations recognized by Mr. Keirns, the district policy would likely be overbroad because it could be interpreted to prohibit possession of history books and to punish innocent conduct in circumstances where there is no threat of disruption. As it has been actually applied by school administrators, however, the policy permits the administrator to consider whether the student's conduct was willful,[4] whether the student displayed the symbol in some manner, and

---

3. In the First Amendment area, the Supreme Court has permitted challenges on overly broad statutes with no requirement that the person making the challenge show that his own conduct could not be regulated by a more narrowly drawn statute. *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Litigants have thus been permitted to challenge a statute not because their own rights have been violated, but because an overly broad statute may

cause others not before the court to refrain from constitutionally protected speech or expression. *Id.*

4. "Willful" means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

whether the conduct had the effect of creating ill will, and the district does not interpret the policy to prohibit the use or possession of such symbols for legitimate educational purposes. These limitations make it likely that the policy will only apply in circumstances where it is constitutional to do so under *Tinker* and *Bethel*. In light of the actual construction given the policy by school administrators, the court concludes that the policy does not reach a substantial amount of protected conduct and is not unconstitutionally overbroad. The evidence does not show a substantial danger that the policy will significantly compromise the First Amendment rights of other students.

■■■ Plaintiff also argues that the Racial Harassment or Intimidation policy must be declared void because it is unconstitutionally vague. Under the "void for vagueness doctrine," a governmental regulation may be declared void if it fails to give a person adequate warning that his conduct is prohibited or if it fails to set out adequate standards to prevent arbitrary and discriminatory enforcement. *See Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

■■■ The court concludes that the Racial Harassment or Intimidation policy is not unconstitutionally vague.[5] Insofar as plaintiff is arguing that the policy was too vague for him to understand, the evidence shows that T.W. knew he was violating the policy when he drew the flag. Such a state of mind is inconsistent with any claim that the policy did not give plaintiff fair warning that his conduct was prohibited. *Cf. Screws v. United States,* 325 U.S. 91, 101–102, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion) ("The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."). Insofar as plaintiff's facial challenge based on vagueness is concerned, the court again finds that

in light of the actual construction of the policy given by school administrators—including the requirement that the student's conduct be willful and the exception for legitimate educational purposes—the policy gives students sufficient warning of what is prohibited and provides a sufficient guide for enforcement. As the Supreme Court noted in *Bethel School District:*

> We have recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." [cite omitted] Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.

*Id.* 478 U.S. at 686, 106 S.Ct. 3159. Although the flexible policy and enforcement procedure used by the school district in this case would surely be unconstitutional in the context of a criminal proceeding, the court concludes that it falls within the range of authority given to administrators to control student conduct in the public schools. In sum, the court finds that the policy gives students fair notice of what conduct is prohibited and is not unconstitutionally vague.

■■■ Plaintiff's final argument is that the Racial Harassment policy is unconstitutional because the district permits students to possess Confederate flag symbols in some circumstances but not in others. Plaintiff believes this is an impermissible prohibition on the content of expression and that it singles out and attempts to suppress one particular viewpoint. (*Citing R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) and *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). Clearly, a prohibition of the type involved in this case would be intolerable if applied to adults in other settings. But this case in-

---

5. Although the court previously indicated in its summary judgment ruling that only the First Amendment claims would be heard at trial, it did not mean to exclude plaintiff's vagueness challenge, which arises in part under the Due Pro-

cess Clause of the Fourteenth Amendment. *See Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (the void for vagueness doctrine finds its basis in the guarantee of due process).

volves middle school students in a public school district with a recent history of racial disturbances. Where, as here, the evidence shows that the prohibition is justified under *Tinker* and *Bethel School District*, the Supreme Court has made clear that the First Amendment does not prevent a public school from prohibiting certain types of speech that would otherwise be protected. That is the case here. Contrary to being an impermissible classification, the district's distinction between appropriate uses of the Confederate flag and uses that are likely to lead to a disruption is a narrowing construction that ensures that the policy is consistent with the requirements of *Tinker*. Moreover, the court notes that the district has not singled out Confederate flags, but prohibits a number of items that may lead to a disturbance as well, such as "Black Power" and "Neo-Nazi" symbols. In sum, the court finds that the district's prohibition does not violate the First Amendment.

### IV.

The evidence presented to the court shows that the school district's Racial Harassment or Intimidation policy was adopted to prevent racial disturbances of the type that occurred in 1995, and that the school district acted within its constitutional authority in enacting such a policy. Plaintiff has failed to show that the school district's adoption and application of this policy violated his First Amendment rights. He has also failed to show a likelihood that the district will violate the First Amendment rights of other students in its application of the policy.

Under the evidence presented, this case is not about the fundamental right to freedom of speech, but is instead a question of the appropriate discipline for a student's willful violation of a school policy. As such, it fell within the authority of school administrators to take such action as they concluded was necessary to maintain discipline in the school. "Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *New Jersey v. T.L.O.*, 469 U.S. 325, 350, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Powell, J., concurring).

The federal judicial power may be invoked when a student has been deprived of his constitutional rights by a public official. But the federal courts do not sit to supervise or to second guess the day-to-day decisions of school administrators in operating the public schools. To the contrary, the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507. "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

### V.

In accordance with the foregoing findings and the previous rulings of the court, plaintiffs' motion for injunctive, declaratory and other relief is hereby DENIED and the complaint is DISMISSED on the merits. The clerk is directed to enter judgment in favor of the defendant school district. IT IS SO ORDERED this 11th day of August, 1998, at Wichita, Kansas.