**F I L E D**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TERRY WEST, individually and as
guardian of a minor, T.W.;
T.W., a minor,

     Plaintiffs-Appellants,

v.

DERBY UNIFIED SCHOOL DISTRICT
NO. 260,

     Defendant-Appellee.

No. 98-3247

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 98-CV-1163)
(23 F. Supp. 2d 1223)

Jason M. Sneed of Lathrop & Gage L.C., Overland Park, Kansas, for Plaintiffs-Appellants.

Jeffrey L. Griffith of Griffith & Griffith (M. Kathryn Webb and Richard J. Liby of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., Wichita, Kansas, with him on the brief), Derby, Kansas, for Defendant-Appellee.

Robert L. Hawkins, III of Hawkins Law Offices, Jefferson City, Missouri, filed an Amicus Curiae Brief for Sons of Confederate Veterans, Inc., in support of Plaintiffs-Appellants.

Julie Underwood of National School Boards Association, Alexandria, Virginia, and Cynthia Lutz Kelly of Kansas Association of School Boards, Topeka, Kansas, filed an Amicus Curiae Brief in support of Defendant-Appellee.

Before **BALDOCK**, **McWILLIAMS**, and **ANDERSON**, Circuit Judges.

**BALDOCK**, Circuit Judge.

Defendant Derby Unified School District # 260 is a school district in Sedgwick County, Kansas, responsible for operating Derby Middle and High Schools. In response to incidents of racial tension between black and white students at Derby High School during 1995, the school district adopted a "Racial Harassment and Intimidation" policy which provides in relevant part:

> District employees and student(s) shall not racially harass or intimidate another student(s) by name calling, using racial or derogatory slurs, wearing or possession of items depicting or implying racial hatred or prejudice. District employees and <u>students shall not at school, on school property or at school activities wear or have in their possession any written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred.</u> (<u>Examples</u>: clothing, articles, material, publications or <u>any item that denotes</u> Ku Klux Klan, Aryan Nation-White Supremacy, Black Power, <u>Confederate flags</u> or articles, Neo-Nazi or any other "hate" group. This list is not intended to be all inclusive). Violations of this policy shall result in disciplinary action by school authorities. For students there will be a three day out-of-school suspension for the first offense with a required parent conference prior to readmittance. . . .

(emphasis added).

Derby Middle School's assistant principal, Brad Keirns, suspended Plaintiff T.W., then a seventh grade student, for three days during the 1997-98 academic year after T.W. drew a Confederate flag on a piece of paper during math class in violation of the district's policy. T.W.'s father promptly filed suit for injunctive relief against the

2

school district on his son's behalf under 42 U.S.C. § 1983, alleging that the school district's policy (1) violated his son's First Amendment free speech right, (2) was unconstitutionally vague and overbroad, (3) violated his son's Fourteenth Amendment right to procedural due process, and (4) violated his son's Fourteenth Amendment right to equal protection.

On the parties' cross motions for summary judgment, the district court ruled in favor of the school district on T.W.'s due process and equal protection claims. See West v. Derby Unified Sch. Dist. # 260, No. 98-1163-WEB, unpub. order (D. Kan. July 27, 1998). The court held that T.W. received the process due him because before deciding to suspend T.W., the assistant principal informed T.W. of the basis for the charge against him, and gave him an opportunity to present his side of events, which T.W. did in writing. Id. at 18. The court further held that the school district's policy did not violate equal protection by discriminating against students who possessed the Confederate flag to express a viewpoint, rather than for legitimate educational purposes. Id. at 18-19. The district court reserved ruling on the questions of whether the school district's policy violated T.W.'s free speech right, or was vague and overbroad, until after a bench trial.

Following trial, the district court entered judgment in favor of the school district on all counts. See West v. Derby Unified Sch. Dist. # 260, 23 F. Supp. 2d 1223 (D. Kan. 1998). As to T.W.'s free speech claim, the district court held that the school district's policy did not violate the First Amendment because "school officials in Derby had

3

evidence from which they could reasonably conclude that possession and display of Confederate flag images, when unconnected with any legitimate educational purpose, would likely lead to a material and substantial disruption of school discipline." Id. at 1232. As to T.W.'s claim that the district's policy was overbroad, the court held that the policy was not unconstitutionally overbroad as applied by school administrators, because "the policy permits the administrator to consider whether the student's conduct was willful, whether the student displayed the symbol in some manner, and whether the conduct had the effect of creating ill will, and the district does not interpret the policy to prohibit the use or possession of such symbols for legitimate educational purposes." Id. at 1234-35. As to T.W.'s claim that the policy was void for vagueness, the court held that the policy provided T.W. fair warning of his prohibited conduct because T.W. knew he was violating the school district's policy when he drew the flag. Id. at 1235.

T.W. appeals, raising the same arguments against the school district that he did in the district court. We exercise jurisdiction under 28 U.S.C. § 1291. We review the ultimate question of the constitutionality of the school district's actions de novo. See United States v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995). We review the underlying factual basis for the district court's decision for clear error. Id. Applying this standard, we affirm the judgment of the district court substantially for the reasons stated in the district court's two opinions.

I.

A detailed recitation of the district court's findings of fact in this case, which are amply supported by the record and neither party seriously disputes, is ably set forth in the district court's second opinion. West, 23 F. Supp. 2d at 1225-31. We need not fully repeat those findings here. Suffice it to say that in early 1995, several verbal confrontations occurred between black and white students at Derby High School. Some white students wore shirts bearing the image of the Confederate flag, while some black students wore shirts with an "X", denoting support for the teachings of Malcolm X. Members of the Aryan Nation and Ku Klux Klan became active off campus circulating materials to students encouraging racism. Around the same time, graffiti stating such things as "KKK" (Ku Klux Klan), "KKKK" (Ku Klux Klan Killer), and "Die Nigger" appeared on campus in bathrooms and on walls and sidewalks. School officials received reports of racial incidents on school buses and at football games. At least one fight broke out as a result of a student wearing a Confederate flag headband. The Derby Middle School was not immune from the racial tensions. Although the tensions were not widespread and involved relatively few students at the middle school, incidents occurred involving the Confederate flag. These included students drawing the Confederate flag on their notebooks and arms.

In response to the situation, the Derby School District organized a 350-member task force comprised of parents, teachers, and other community members to propose a

course of action for the district. The task force recommended the adoption of a racial harassment policy to help alleviate the problem. The school district subsequently adopted the "Racial Harassment and Intimidation" policy at issue in this case. The policy resulted in a "marked decline of incidents of racial harassment and discord" in the school district. Id. at 1228. "The number of referrals in the middle school dealing with racial problems in the last two years are significantly lower than the number observed in 1996." Id.

At the beginning of each school year, the school district requires all students at the middle school to review a student handbook which sets forth the school district's policies, including the harassment and intimidation policy. In August 1997, T.W. signed an acknowledgment form stating: "'I have reviewed and understand the disciplinary policy at DMS as outlined in the DMS agenda book.'" Id. Teachers at the middle school then reviewed the policies in the handbook with students, including T.W. Nevertheless, T.W. became involved in numerous disciplinary incidents during the 1997-98 school year. At one point, T.W. received a three-day suspension for calling another student "blackie." After another incident, T.W. had an administrative conference with the school's assistant principal, who reviewed the harassment and intimidation policy with T.W. Accordingly, T.W. was well aware of the school district's policy prohibiting the drawing of the Confederate flag.

On April 14, 1998, during math class at the Derby Middle School, T.W., at the prompting of another student, drew a Confederate flag on a piece of paper. The other

student took the drawing and showed it to the math teacher. The teacher turned the drawing over to the school's assistant principal. When confronted, T.W. admitted to the assistant principal that he had drawn the picture and provided a written statement regarding the occurrence.[1]

Pursuant to the school district's policy, the assistant principal suspended T.W. from school for three days. The school district did not dispute that T.W. never intended to harass or intimidate any student by drawing the Confederate flag. The assistant principal, however, did consider certain factors outside the policy language to reach his decision, namely that (1) prior to the incident he had reviewed the harassment and intimidation policy with T.W., (2) T.W. intentionally violated the policy, (3) T.W. displayed his drawing to another student, and (4) other students warned T.W. not to draw the Confederate flag. Based on this evidence, the district court concluded:

> The intimation that T.W. acted innocently and without any improper
> purpose is contrary to the evidence. While T.W. may not have intended to

---

[1] T.W.'s statement read:

I was sitting in math class and I had a piece of paper that I was going to make a plane on and Dusty Houstin told me write a rebel flag on it and I said no and he asked me if I even knew what it was and I said yes but I didn't know what it meant. So I drew it and he turned me in.

Appellee's App. at 281. Statements obtained from two other students who had been sitting with T.W. in math class indicated they warned T.W. that he would get in trouble if he drew the Confederate flag. One student wrote that T.W. "said he didn't care and drew it anyway." Id. at 283.

7

harass anyone by drawing the Confederate flag, it is clear to the court that he knowingly and intentionally violated the policy against possession of such symbols at school.

Id. at 1230.[2]

## II.

A constant theme throughout T.W.'s legal argument is that his drawing of the Confederate flag was "peaceful and nonthreatening." T.W. argues that "without any finding that T.W. intended to actually harass or intimidate any person by said possession, the school district unconstitutionally applied its policy against T.W." We now consider each of T.W.'s constitutional arguments in turn, rejecting any notion that the Constitution requires a finding of an intent to harass or intimidate before the Derby School District may apply its "Racial Harassment and Intimidation" policy to noncomplying students. Instead, we reaffirm the principle that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities." Epperson v. Arkansas, 393 U.S. 97, 104 (1968).

## A.

---

[2] The district court viewed T.W.'s testimony regarding the events surrounding his suspension with skepticism: "To put it charitably, the court finds that T.W. demonstrated a 'convenient memory' when he recounted those events. T.W. attempted–as some adolescents in such a situation are inclined to do–to minimize any evidence that he knew his actions were wrong." West, 23 F. Supp. 2d at 1230.

We first address T.W.'s argument that "by denying him any meaningful opportunity to contest whether he actually 'harassed' or 'intimidated' any student or intended to do so, the school district denied T.W. his right to due process . . . as guaranteed by the Fourteenth Amendment." No one disputes that a student faced with the possibility of suspension from public school is entitled to due process. The Supreme Court put that issue to rest in Goss v. Lopez, 419 U.S. 565, 579 (1975) ("[S]tudents facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing.") (emphasis in original). The next question then is what process is due a student faced with the possibility of a three-day suspension from school. Goss resolved that issue as well. As to public school suspensions of ten days or less–

> [D]ue process requires . . . that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. . . . There need be no delay between the time "notice" is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at the discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

Goss, 419 U.S. at 581-82.

On appeal (unlike in the district court), T.W. does not seriously argue, nor could he, that he failed to receive the process due him under Goss. The assistant principal plainly gave T.W. notice of the charges against him and an opportunity to present his side

9

of events before deciding to suspend him. The assistant principal determined that T.W. had wilfully violated the school district's harassment and intimidation policy, which T.W. knew prohibited his drawing of the Confederate flag.

Instead, T.W. argues that he failed to receive any "meaningful" hearing in the matter because the assistant principal never found that T.W. intended to harass or intimidate anyone by drawing the Confederate flag. T.W.'s argument is meritless. Goss sets forth the requirements of a "meaningful" hearing, which is exactly what T.W. received, in connection with school suspensions of ten day or less. T.W. in effect asks us to impose an intent element upon the school district's policy similar to that of a criminal statute. Yet public school districts are not courts of law and their disciplinary policies and procedures do not equate with penal codes. To impose in "countless" disciplinary suspensions a requirement that the suspect student possess a mens rea akin to criminal intent might well require trial-like procedures and proof which could "overwhelm administrative facilities in many places and by diverting resources, cost more than it would save in educational effectiveness." Id. at 583.

This is not to say that educators should ignore a student's intentions in addressing disciplinary matters. But "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." New Jersey v. T. L. O., 469 U.S. 325, 340 (1985). In this case, the district court found that after T.W. received

10

notice and an opportunity to be heard, the assistant principal suspended him for "knowingly and intentionally" violating a school district policy which plainly prohibited drawing  the Confederate flag–a policy with which T.W. was well familiar.  West, 23 F. Supp. 2d at 1230.[3]  That finding is not clearly erroneous, but rather is supported by the overwhelming weight of the evidence.  We conclude that T.W. received all the process due him under the Fourteenth Amendment.

### B.

T.W. next asserts that the school district violated his "rights as protected by the Equal Protection Clause in that [the district] has 'selectively' excluded his possession of the Confederate flag," while permitting other students to possess the flag in history books and other approved materials.  The district court properly noted that the question of whether a legitimate government interest supports the school district's content-based restriction is essentially an inquiry into whether the restriction violates T.W.'s First Amendment free speech right.  Thus, T.W.'s equal protection claim is more properly considered together with his First Amendment challenge.  See R. A. V. v. City of St. Paul,

---

[3]  Despite T.W.'s claim to the contrary, the school district's harassment and intimidation policy is not a "zero tolerance" policy, removing decisionmaking authority from school officials and depriving students of "meaningful" process.  As the district court found, West, 23 F. Supp. 2d at 1229, numerous factors aside from the plain language of the policy went into the assistant principal's decision to suspend T.W.  Those factors were "that T.W. admitted to making the drawing, that other students saw the drawing, that other students had warned T.W. not to make the drawing, and that [the assistant principal] had reviewed the Racial Harassment and Intimidation policy with T.W. following a previous incident."  Id.

505 U.S. 377, 384 n.4 (1992). Still, T.W. insists on propounding his equal protection argument on appeal.

First Amendment concerns aside for the moment, we note that public school students are not a suspect class under the Equal Protection Clause. Thus, as an arm of the State, the Derby School District may consistent with the Fourteenth Amendment forbid students during school hours and on school grounds from possessing the Confederate flag outside of school-approved materials so long as its policy is rationally related to a legitimate government interest. This is all the Equal Protection Clause requires. See Kimel v. Florida Bd. of Regents, 120 S. Ct. 631, 645-46 (2000). The school district's legitimate interest in this case is clear–to prevent potentially disruptive student conduct from interfering with the educational process. We easily conclude that the school district's harassment and intimidation policy did not violate T.W.'s right to equal protection under the Fourteenth Amendment.

C.

We also conclude that the Derby School District did not violate T.W.'s First Amendment right to free speech when it suspended him from school for three days after he drew a picture of the Confederate flag during class in violation of the school district's harassment and intimidation policy.[4] To be sure, T.W.'s display of the Confederate flag

_____

[4] At least two other circuits have addressed student suspensions based upon display of the Confederate flag. In Melton v. Young, 465 F.2d 1332 (6th Cir. 1972), a

(continued...)

12

could well be considered a form of political speech to be afforded First Amendment protection outside the educational setting. And while students do not "shed the constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969), the Supreme Court has–

> recognized that the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment. A school need not tolerate student speech that is inconsistent with its basic educational mission even though the government could not censor similar speech outside the school.

Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (internal citations and quotations omitted). See also Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683 (1986) ("The determination of what manner of speech in the classroom . . . is inappropriate properly rests with the school board."). Thus, where school authorities

---

[4](...continued)
divided panel of the Sixth Circuit held that a student's suspension for refusal to stop wearing a Confederate flag patch did not violate his First Amendment rights where substantial racial disorder had occurred at the racially integrated school and school officials had every right to anticipate that a tense racial situation continued to exist. Just last summer in Denno v. School Bd. of Volusia County, Fla., 182 F.3d 780 (11th Cir.), vacated 193 F.3d 1178 (11th Cir. 1999) a panel of the Eleventh Circuit reversed the district court's dismissal of a student's complaint alleging a violation of his First Amendment rights when school officials suspended him for displaying a picture of the Confederate flag. Accepting the complaint's allegations as true, the court stated that a student had a right to display the flag which gave rise to nothing greater than a undifferentiated fear or apprehension of disturbance. Interestingly, three months later, the panel vacated its opinion and ordered rehearing before the panel. As of today, the case remains pending.

reasonably believe that a student's uncontrolled exercise of expression might "substantially interfere with the work of the school or impinge upon the rights of other students," Tinker, 393 U.S. at 509, they may forbid such expression.[5]

Of course, school officials' "undifferentiated fear or apprehension" of a disturbance is not enough to overcome a student's right to freedom of expression. Id. at 508. The evidence in this case, however, reveals that based upon recent past events, Derby School District officials had reason to believe that a student's display of the Confederate flag might cause disruption and interfere with the rights of other students to be secure and let alone. See id. As a result of racial tensions in the school district which threatened to disrupt the educational process, these officials approved the "Racial Harassment and Intimidation" policy. We believe the district court was correct in rejecting T.W.'s First Amendment challenge to the school district's policy, West, 23 F. Supp. 2d at 1231-34, and adopt its analysis as our own:

> [S]chool officials in Derby had evidence from which they could reasonably conclude that possession and display of Confederate flag images, when unconnected with any legitimate educational purpose, would likely lead to a

---

[5] In Tinker, students were suspended pursuant to a hastily enacted school policy that forbid the wearing of black armbands in protest of the Vietnam war. In overturning the students' suspension, the Court emphasized repeatedly that no showing had been made that engaging in the forbidden conduct would "materially and substantially interfere with the requirement of appropriate discipline in the operation of the school." 393 U.S. at 509. Unlike here, "the wearing of armbands in the circumstances of th[at] case was entirely divorced from actually or potentially disruptive conduct." Id. at 505 (emphasis added). The Court further noted that the school had singled out for prohibition only black armbands. Other controversial and political symbols were not forbidden. Id. at 510-11.

14

material and substantial disruption of school discipline. The district experienced a series of racial incidents or confrontations in 1995, some of which were related to the Confederate flag. The incidents included hostile confrontations between a group of white and black students at school and at least one fight at a high school football game. The Racial Harassment policy enacted in response to this situation was clearly something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. The history of racial tension in the district made administrators' and parents' concerns about future substantial disruptions from possession of Confederate flag symbols at school reasonable. The fact that a full-fledged brawl had not yet broken out over the Confederate flag does not mean that the district was required to sit and wait for one. . . . In this case, the district had a reasonable basis for forecasting disruption from display of such items at school, and its prohibition was therefore permissible . . . . The fact that T.W.'s conduct may not have resulted in an actual disruption of the classroom . . . does not mean that the school had no authority to act. The district had the power to act to prevent problems before they occurred; it was not limited to prohibiting and punishing conduct only after it caused a disturbance.

Id. at 1233 (internal citations and quotations omitted). Accordingly, T.W.'s First Amendment free speech challenge to the school district's policy fails.

D.

T.W. also presents a facial challenge to the school district's harassment and intimidation policy, arguing that the policy is unconstitutionally vague and overbroad. T.W. asserts that "because the policy fails to adequately warn students what symbols they are prohibited from possessing and brings within its scope so much innocent conduct" the policy must be stricken as both vague and overbroad. Until the harassment and intimidation policy "is narrowed to reach only unprotected activity," T.W. claims we should bar its enforcement entirely.

15

We begin with the precept that "[a] facial challenge to a [law] is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a [law] may constitutionally be applied will not be heard to challenge that [law] on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973). As the Supreme Court recently explained in Los Angeles Police Dept. v. United Reporting Publ'g Corp., 120 S. Ct. 483, 489 (1999):

> This general rule reflects two "cardinal principles" of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication. "By focusing on the factual situation before us, and similar cases necessary for a constitutional rule, we face 'flesh and blood' legal problems with data 'relevant and adequate to an informed judgment.'"

(internal citation omitted) (quoting New York v. Ferber, 458 U.S. 747, 767-68 (1982)). Consistent with the foregoing, we believe cases of alleged unconstitutional enforcement of a public school district's disciplinary policies, like any other laws, are best addressed in most instances "when (and if) they arise, rather than prophylactically through the disfavored mechanism of a facial challenge." City of Chicago v. Morales, 527 U.S. 41, ___ (1999) (Thomas, J., dissenting) (citing Salerno, 481 U.S. at 745).

One exception exists, however, to the rule that courts will not pass upon facial challenges to laws. The exception is First Amendment challenges to laws based on

16

overbreadth. United Reporting Publ'g, 120 S. Ct. at 488. Yet, the overbreadth doctrine is "not casually employed." Id. at 489. "Because of the wide-reaching effects of striking down a [law] on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then, 'only as a last resort.'" Id. A court should address an overbreadth challenge to a law only when the law may have a chilling effect on the free speech rights of parties not before the court. See id. at 488.

To the extent that T.W.'s facial challenge to the school district's policy seeks to rely on the effect the policy may have on parties not before the court, his challenge fails. This is because "no realistic danger" exists that the Derby School District's policy will "significantly compromise recognized First Amendment protections of parties not before the court." Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984). In discerning the reach of the policy, we consider any limiting construction which the school district has given the policy. See Osborne v. Ohio, 495 U.S. 103, 120 & n.14 (1990) (a law may be construed to avoid potential overbreadth problems). The district court correctly recognized that as construed by the school district–

> the policy permits the administrator to consider whether the student's conduct was willful, whether the student displayed the symbol in some manner, and whether the conduct had the effect of creating ill will, and the district does not interpret the policy to prohibit the use or possession of such symbols for legitimate educational purposes. These limitations make it likely that the policy will only apply in circumstances where it is constitutional to do so . . . . The evidence does not show a substantial danger that the policy will significantly compromise the First Amendment

17

rights of other students.

West, 23 F. Supp. 2d at 1234-35. To our knowledge, the Derby Middle School has never disciplined a student for possessing in textbooks and other school materials with legitimate educational purposes depictions of the Confederate flag or other racially divisive symbols. Like the district court, we conclude that as construed by the school district, the harassment and intimidation policy does not threaten protected speech and is not unconstitutionally overbroad.

Similarly, the school district's policy is not unconstitutionally vague. The Derby School District's harassment and intimidation policy might be void for vagueness if a reasonable student of ordinary intelligence who read the policy could not understand what conduct it prohibited. See Broadrick, 413 U.S. at 608. Still, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, . . . school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." Bethel Sch. Dist., 478 U.S. at 686. We are satisfied that at the time of the occurrence little question existed in the mind of T.W. as to the meaning of the school district's policy or whether it prohibited him from drawing the Confederate flag during class. The policy expressly prohibits any student from possessing in his own handwriting a depiction of the Confederate flag. T.W. had reviewed the policy on multiple occasions. Moreover, T.W. admits that the district court "correctly stated that T.W. knew that the act of drawing a Confederate flag

18

violated written school policy." See United States Civil Serv. Comm'n v. National Ass'n. of Letter Carriers, 413 U.S. 548, 579 (1973). As the district court concluded: "Such a state of mind is inconsistent with any claim that the policy did not give [T.W.] fair warning that his conduct was prohibited." West, 23 F. Supp. 2d at 1235.

AFFIRMED.