Harper v. Poway Unified Sch. Dist., No. 04-57037

**KOZINSKI**, Circuit Judge, dissenting:

While I find this a difficult and troubling case, I can agree with neither the majority's rationale nor its conclusion. On the record to date, the school authorities have offered no lawful justification for banning Harper's t-shirt and the district court should therefore have enjoined them from doing so pending the outcome of this case. Harper, moreover, raised a valid facial challenge to the school's harassment policy, and the district court should have enjoined the policy as well.

### The T-shirt

As the majority correctly notes, school speech falls into three categories, each governed by its own standard. The first category involves school-sponsored speech, which is governed by Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 270–71 (1988). The second involves vulgar or plainly offensive speech, and it is governed by Bethel School District No. 403 v. Fraser, 478 U.S. 675, 683–85 (1986). All other speech falls into the third category and is governed by Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 511–14 (1969).

Harper's t-shirt was clearly not school sponsored, so the Hazelwood

standard—highly deferential to school authorities—does not apply. Until recently, it was a closer question whether Harper's t-shirt involved plainly offensive speech, which may be banned by the school under Fraser. See Scott v. School Bd. of Alachua County, 324 F.3d 1246, 1249 (11th Cir. 2003) (per curiam) (upholding ban on Confederate flag under both Tinker and Fraser). But our recent opinion in Frederick v. Morse, 439 F.3d 1114 (9th Cir. 2006), puts this issue to rest, explaining that "plainly offensive" under Fraser is determined by the language used, not the idea conveyed. See id. at 1119–21. Since there was nothing offensive about the language of Harper's t-shirt, the school authorities here cannot rely on Fraser.[1]

---

[1] Reconciling Tinker and Fraser is no easy task. The Supreme Court majority in Fraser seems to have been influenced by the indecorousness of Fraser's comments, which referred to a fellow student in terms that could be understood as a thinly-veiled phallic metaphor. See Fraser, 478 U.S. at 687 (Brennan, J., concurring) (quoting Fraser's comments). The curious thing, though, is that Fraser used no dirty words, so his speech could only have been offensive on account of the ideas he conveyed—the ideas embodied in his elaborate double-entendre. So construed, however, Fraser swallows up Tinker, by suggesting that some ideas can be excluded from the high school environment, even if they don't meet the Tinker standard.

Fraser might also be read as dealing with the situation involving a captive audience because the speech was given at a school sponsored assembly. However, attendance at the assembly was merely expected, not required, so students were perfectly free not to listen to the offensive speech. See Fraser, 478 U.S. at 677. Then, again, how were students to know that they would hear a sexually offensive

(continued...)

If the school's ban of the shirt is to be upheld, then, it must be because it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Tinker, 393 U.S. at 513.

**1.** School authorities may ban student speech based on the existence of "any facts which might reasonably [lead] school authorities to forecast substantial disruption." Id. at 514. While we do not require school officials to be certain that disruption will occur, see LaVine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir. 2001), they must present "evidence that [the ban] is necessary to avoid material and substantial interference with schoolwork or discipline." Tinker, 393 U.S. at 511 (emphasis added).

The school authorities here have shown precious little to support an inference that Harper's t-shirt would "materially disrupt[] classwork." One teacher, David LeMaster, said that several students in class were "off-task talking

---

[1](...continued)
speech when they attended an assembly designed to debate the merits of candidates for student political office? Perhaps Fraser is best read as dealing with the situation where the school sponsors the activity in question and invites or encourages students to attend. By giving its imprimatur to the activity, the school is, in effect, assuring potential attendees that they will not be subjected to anything plainly offensive. So read, Fraser is merely a precursor to Hazelwood, and has no application at all to speech that has no school sponsorship at all—like talk in the corridors or messages on t-shirts worn by students.

about [the] content of 'Chase's shirt' when they should have been working." LeMaster decl. at 2. Surely, however, it is not unusual in a high school classroom for students to be "off-task." The scène à faire of high school students bored or distracted in class is a cliché.[2] LeMaster gives no indication that the distracted students refused to get back on task once they were admonished, or that the t-shirt caused a commotion or otherwise materially interfered with class activities. As this is the only evidence that Harper's t-shirt interfered with classroom learning, I find it ludicrously weak support for banning Harper's t-shirt on the ground that it would "materially disrupt[] classwork." Tinker, 393 U.S. at 513.

The remaining two pieces of evidence presented by the defendants do not involve disruption of classwork, and thus must be judged by the "substantial disorder" standard. Id. School authorities have far less latitude to ban speech that does not interfere with learning situations. Between classes, students are free—indeed encouraged—to engage in discussions that are not strictly school related. Politics, sports, movies, music and personal matters are the ordinary

---

[2] See, e.g., Ferris Bueller's Day Off (Paramount Pictures 1986); J.K. Rowling, Harry Potter and the Half-Blood Prince (2005); Buffy the Vampire Slayer; Beverly Hills 90210; The O.C.; Saved by the Bell; Veronica Mars; and zillions more.

subjects of discourse in high school corridors and lunch rooms.[3]  Occasionally such discussions can become heated, but so long as they don't escalate into violence or the threat of violence, and do not otherwise interfere with school operations, they cause no disruption of the school environment.

Defendants point to Harper's own report that "he [had been] involved in a tense verbal conversation with a group of students" earlier that day, but this is hardly the stuff of which substantial disorder is made.  Fisher decl. at 3. People—judges even—often have strong views and their discussions will naturally reflect this intensity of feeling.  There is nothing at all wrong with that, and it normally does not lead to substantial disorder.  There is no indication that Harper's discussion turned violent or disrupted school activities.  There is no evidence that it involved shouting or threats, or that it interfered with the passage of students to and from class.  The discussion, tense though it may have been, did not have to be broken up by school authorities; rather, it seems to have come to a peaceful conclusion.  The best proof that this "tense verbal conversation" did not cause substantial disorder is that the school authorities knew nothing about the incident

---

[3]  This theme too has been mined by screenwriters ad nauseam.  See, e.g., The Breakfast Club (Universal Pictures 1985); Clueless (Paramount Pictures 1995); 10 Things I Hate About You (Touchstone Pictures 1999); Mean Girls (Paramount Pictures 2004); Saved! (United Artists Pictures 2004).

until Harper himself reported it. The only thing one can infer from this evidence is that, whatever strong feelings Harper's t-shirt may have aroused, it did <u>not</u> cause any disruption of school activities, substantial or otherwise.

The second piece of evidence on which the school authorities rely doesn't involve Harper at all. It consists of surprisingly vague references to some incidents that had occurred a year earlier, "during the days surrounding the Day of Silence between certain gay and straight students." Fisher decl. at 3. Poway High School Principal Scott E. Fisher describes the situation as follows: "For example, an altercation had occurred which required me to physically separate the students. Those students were disciplined for their actions." <u>Id.</u> Assistant Principal Lynell Antrim has the following description:

> The previous year, in April, 2003, the Day [of Silence] brought some volatile behavior between students, and there was an unsanctioned Straight-Pride Day a week or so later. No club organized that Straight Pride Day, but there were store-printed shirts with inflammatory messages and some hand-scripted T-shirts with derogatory remarks. Some students last year were asked to remove the shirts and did so. Other students had an altercation and were suspended for their actions.

Antrim decl. at 2. Finally, Assistant Principal Edward L. Giles explains as follows:

> I told Ron Harper [Chase's dad] of our concern for the safety of our students when they altered their clothes to carry messages that could be inflammatory or demeaning. I told him we had some situations in

the past of physical altercations because someone took exception to a message concerning sexual orientation on another person. I explained to him we did not want messages that carried with them a negative tone.

Giles decl. at 4.

Evidence that derogatory messages on t-shirts had resulted in physical altercations between students in the past certainly could be relevant in determining whether Harper's message would be likely to cause such disruption in the future. Unfortunately, however, it is not clear from these declarations that the messages on the t-shirts were in any way involved in the previous year's altercation; Antrim's declaration seems to say that the students involved in the altercation were different from the students who wore the t-shirts. Only Giles suggests a connection between the t-shirts and the altercations, and then somewhat obliquely.[4] More importantly, we are not told how closely the messages in the previous year mirrored that on Harper's t-shirt. For all we know, the previous year's t-shirts contained invective, profanity or epithets; they may have called for violence against homosexuals. Nor

---

[4] Giles, it will be noted, is swearing only that this is what he told Ron Harper; he is not swearing this is, in fact, what had happened the previous year. It's possible that Giles's statement to Harper was exaggerated or tailored to help defuse the situation. As Giles was not then under oath, a little stretching of the truth to jolly along an angry parent might have been perfectly okay. However, when this statement is imported into the litigation as hearsay, I'm not sure we are bound to believe anything more than this is what Giles told Harper.

do we know whether the altercations in question were caused by the t-shirts alone, or by a combination of the t-shirts and oral taunts by those wearing the shirts or by those who opposed them. In short, without knowing a great deal more about the situation in the previous year—information the school authorities surely had available and could have put into the record—I cannot say that defendants reasonably concluded that Harper's wearing of <u>this</u> t-shirt was likely to cause substantial disruption.[5]

There is, in fact, persuasive evidence that it would not. I have already mentioned the apparently peaceful confrontation Harper had with other students that very day; while words were exchanged, the students managed the situation well and without intervention from the school authorities. No doubt, everyone learned an important civics lesson about dealing with others who hold sharply divergent views. Moreover, Harper wore a t-shirt with substantially the same message the entire previous day, yet there was no disruption. <u>See</u> maj. op. at 4–5.

---

[5] I must also mention the incongruity of prohibiting speech because others respond to it with violence. Assuming that someone in the previous year wore a t-shirt similar to Harper's, and was physically attacked "because someone took exception to a message concerning sexual orientation," Giles decl. at 4, I'm not prepared to say that this alone would be sufficient to ban the shirt. Maybe the right response is to expel students who attack other students on school premises. <u>But see</u> <u>Karp</u> v. <u>Becken</u>, 477 F.2d 171, 173, 175–76 (9th Cir. 1973) (upholding confiscation of protest banners based on a variety of factors, including threats of violence by other students).

While I agree that school officials need not wait for students to come to blows, their determination of likely disruption must be reasonable. On this record, I cannot find that it was.

But there is a more fundamental issue here. The record reveals quite clearly that Harper's t-shirt was not an out-of-the-blue affront to fellow students who were minding their own business. Rather, Harper wore his t-shirt in response to the Day of Silence, a political activity that was sponsored or at the very least tolerated by school authorities.[6] The Day of Silence is a protest sponsored by the Gay, Lesbian and Straight Education Network (GLSEN). According to a GLSEN press release, the Day of Silence is "an annual, national student-led effort in which participants take a vow of silence to peacefully protest the discrimination and harassment faced by lesbian, gay, bisexual and transgender (LGBT) youth in schools." Press Release, GLSEN, A New Record for the Day of Silence (Apr. 14, 2004), available at http://www.glsen.org/cgi-bin/iowa/all/news/record/1655.html. The point of this

---

[6] Assistant Principal Antrim in her declaration refers to the Straight-Pride Day the previous year as "unsanctioned," suggesting a contrast with the Day of Silence. The school authorities have a close working relationship with the Gay-Straight Alliance (GSA), the campus club that sponsors the Day of Silence. After last year's "tension" over the Day of Silence, the principal and the associated student body director worked with the GSA throughout the year to set "clearer guidelines" for this year's Day of Silence, and to "problem solve" tension among students about these issues. Antrim decl. at 2.

protest, as I understand it, is to promote tolerance toward all students, regardless of their sexual orientation.  See Antrim decl. at 2.

Tolerance is a civic virtue,[7] but not one practiced by all members of our society toward all others.  This may be unfortunate, but it is a reality we must accept in a pluralistic society.[8]  Specifically, tolerance toward homosexuality and homosexual conduct is anathema to those who believe that intimate relations among people of the same sex are immoral or sinful.  So long as the subject is kept out of the school environment, these differences of opinion need not clash.  But a visible and highly publicized political action by those on one side of the issue will

---

[7]  The majority waxes eloquent about the right of schools "to teach civic responsibility and tolerance as part of its basic educational mission," while suppressing other points of view.  Maj. op. at 38.  But one man's civic responsibility is another man's thought control.  For example, respect for the Constitution and support for the military are commonly regarded as civic virtues.  But laws requiring schools receiving federal funding to hold a Constitution Day or to give military recruiters the names, addresses and phone numbers of their students have proved quite controversial.  See Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, § 111(b), 118 Stat. 2809, 3344 (2004); 20 U.S.C. § 7908; see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 126 S. Ct. 1297 (2006).  Having public schools, and those who fund them, define civic responsibility and then ban opposing points of view, as the majority seems willing to do, may be an invitation to group-think.

[8]  Indeed, tolerance may not always be a virtue.  Tolerating wicked conduct, bigotry or malicious gossip, for example, may not be in the least commendable.  Then there is the question of whether we should tolerate intolerance, a question as imponderable as a Möbius strip.  Whether tolerance is a good or a bad thing may turn on what we think about the thing being tolerated.

provoke those on the other side to express a different point of view, if only to avoid the implication that they agree. See Robert Bolt, A Man for All Seasons act 2, at 88 (1962) ("The maxim of the law is 'Silence gives consent.'").

Given the history of violent confrontation between those who support the Day of Silence and those who oppose it, the school authorities may have been justified in banning the subject altogether by denying both sides permission to express their views during the school day. See, e.g., West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1361, 1366 (10th Cir. 2000) (upholding ban on items that give rise to racial tension such as Confederate flags and Malcolm X t-shirts). I find it far more problematic—and more than a little ironic—to try to solve the problem of violent confrontations by gagging only those who oppose the Day of Silence and the point of view it represents. Or, as Judge Rosen put it in Hansen v. Ann Arbor Public Schools, 293 F. Supp. 2d 780 (E.D. Mich. 2003), "[t]hat Defendants can say with apparent sincerity that they were advancing the goal of promoting 'acceptance and tolerance for minority points of view' by their demonstrated intolerance for a viewpoint that was not consistent with their own is hardly worthy of serious comment." Id. at 801–02.

I cannot imagine that my colleagues would approve this in other situations. Say, for example, one school group—perhaps the Young Republicans—were to

organize a day of support for the war in Iraq by encouraging students to wear a yellow armband. And suppose that other students responded by wearing t-shirts with messages such as "Marines are Murderers" and "U.S. Bombs Kill Babies." If a student whose brother was killed in Iraq assaulted a student wearing one of the anti-war t-shirts, would we approve a school's response that banned the t-shirts but continued to permit the yellow armbands? See R.A.V. v. City of Saint Paul, 505 U.S. 377, 392 (1992) ("[The government] has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."). Not to worry, says the majority, because students can still sport t-shirts that criticize "the President, his administration, or his policies, or otherwise invite political disagreement or debate." Maj. op. at 30. But acceptance of homosexuality is a political disagreement and debate. It's not at all clear to me how one can criticize public officers and their policies without also addressing the controversial policies they adopt. For example, in 2004, San Francisco mayor Gavin Newsom issued marriage licenses to nearly 4,000 gay and lesbian couples. While some people view this as a courageous and principled action, others consider it an abomination. It's not at all clear to me how those in the latter camp could go about expressing their vehement disagreement with Mayor Newsom's policy without also expressing disdain for those who turned out at City Hall to take

advantage of the policy.

Of the possible measures a school might take to deal with substantial disruption of the school environment, those involving viewpoint discrimination would seem to me to be the least justifiable. To quote Judge Rosen once again, "no matter how well-intentioned the stated objective, once schools get into the business of actively promoting one political or religious viewpoint over another, there is no end to the mischief that can be done in the name of good intentions." Hansen, 293 F. Supp. 2d at 803.

**2.** Tinker does contain an additional ground for banning student speech, namely where it is an "invasion of the rights of others." 393 U.S. at 513. The school authorities suggest that Harper's t-shirt violates California Education Code § 201(a), which provides that "[a]ll pupils have the right to participate fully in the educational process, free from discrimination and harassment." Defendants cite no California case holding that the passive display by one student of a message another student finds offensive violates this provision, and I am reluctant to so conclude on my own. The interaction between harassment law and the First Amendment is a difficult and unsettled one because much of what harassment law seeks to prohibit, the First Amendment seems to protect. See Saxe v. State Coll.

Area Sch. Dist., 240 F.3d 200, 206–10 & n.6 (3d Cir. 2001).  Certainly, state law cannot trump the First Amendment by defining "harassment" as any conduct that another person finds offensive; far too much core First Amendment speech could thus be squelched.  See Eugene Volokh, Comment, Freedom of Speech and Workplace Harassment, 39 UCLA L. Rev. 1791 (1992), available at http://www1.law.ucla.edu/~volokh/harass/substanc.htm in updated form.

Harassment law might be reconcilable with the First Amendment, if it is limited to situations where the speech is so severe and pervasive as to be tantamount to conduct.  See Saxe, 240 F.3d at 204–10.  I need not consider whether section 201(a) is susceptible to such a narrowing construction because it is quite clear that Harper's lone message was not sufficiently severe and pervasive to meet the standard articulated in Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Rather, it seems more like the "simple acts of teasing and name-calling," described by the Supreme Court as non-actionable in Davis v. Monroe County Board of Education, 526 U.S. 629, 652 (1999).  The "rights of others" language in Tinker can only refer to traditional rights, such as those against assault, defamation, invasion of privacy, extortion and blackmail, whose interplay with the First Amendment is well established.  Surely, this language is not meant to give state legislatures the power to define the First Amendment rights of students out of

existence by giving others the right not to hear that speech.[9]  Otherwise, a state legislature could effectively overrule Tinker by granting students an affirmative right not to be offended.  To the extent that state law purports to prohibit such language in the school context, it is patently unconstitutional.

Nor can I join my colleagues in concluding that Harper's t-shirt violated the rights of other students by disparaging their homosexual status.  As I understand the opinion, my colleagues are saying that messages such as Harper's are so offensive and demeaning that they interfere with the ability of homosexual students to partake of the educational environment.  This is not a position briefed or argued by any of the parties, and no one introduced any evidence in support of, or opposition to, this proposition.  The school authorities did not try to justify their actions on this ground; instead, they argued that they can ban any t-shirt derogatory to another individual, a proposition that the majority rejects.  See maj. op. at 30.

Such sua sponte lawmaking raises many problems, the first of which is that

---

[9]  It is clear, moreover, that the California legislature did not intend to make inroads into the speech rights of students, since California Education Code § 48950(a) gives students greater speech rights than they have under federal law. While Harper waived reliance on this section as an independent source of authority for his appeal, see maj. op. at 16 n.13, we can certainly consider it in deciding how to construe other provisions of California law.  Given the broad sweep of section 48950(a), it is simply not tenable to claim, as the majority seems to, that California Education Code sections 200 and 201 limit student speech under the "rights of others" prong of Tinker.

it finds no support in the record.  What my colleagues say could be true, but the only support they provide are a few law review articles, a couple of press releases by advocacy groups and some pop psychology.  Aside from the fact that published articles are hardly an adequate substitute for record evidence, the cited materials are just not specific enough to be particularly helpful.  None would seem to meet the standard of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592–94 (1993).

The first article, written by physicians but apparently not peer-reviewed, makes a general statement to the effect that academic under-achievement and other problems of homosexual youths "are the probable consequence of violence and verbal and physical abuse at school."  Susanne M. Stronski Huwiler & Gary Remafedi, Adolescent Homosexuality, 33 Rev. Jur. U.I.P.R. 151, 164 (1999).  The article does not explain what the authors mean by "verbal . . . abuse," so it's not clear that Harper's t-shirt is even covered by the article's findings.  Nor does the article explain the degree to which statements, as opposed to physical abuse, are responsible for the ill effects it discusses.  The second article, written by a lawyer, not a health-care professional, merely points to general problems suffered by gay and lesbian youths during their school years—problems that are reinforced by a variety of school practices and policies.  See Thomas A. Mayes, Confronting

Same-Sex, Student-to-Student Sexual Harassment: Recommendations for Educators and Policy Makers, 29 Fordham Urb. L.J. 641, 655–58 (2001).  The other articles the majority cites also focus on physical abuse or threats, which the school can and should stamp out in a viewpoint neutral way.  See Amy Lovell, "Other Students Always Used to Say, 'Look At The Dykes'": Protecting Students From Peer Sexual Orientation Harassment, 86 Cal. L. Rev. 617, 625–28 (1998); Courtney Weiner, Note, Sex Education: Recognizing Anti-Gay Harassment as Sex Discrimination Under Title VII and Title IX, 37 Colum. Hum. Rts. L. Rev. 189, 221–25 (2005); Kelli Kristine Armstrong, The Silent Minority Within a Minority: Focusing on the Needs of Gay Youth in Our Public Schools, 24 Golden Gate U. L. Rev. 67, 76–77 (1994).  The majority finally resorts to press releases from advocacy groups—hardly a source "whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  What the materials the majority cites do establish is that the success of gay and lesbian teens in school is a complicated phenomenon, influenced by many factors.  Even taking the sources on their own terms, none provides support for the notion that disparaging statements by other students, in the context of a political debate, materially interfere with the ability of homosexual students to profit from the school environment.

Nor do I find the proposition at the heart of the majority's opinion—that

homosexual students are severely harmed by any and all statements casting aspersions on their sexual orientation—so self-evident as to require no evidentiary support. We take judicial notice of facts that aren't reasonably subject to dispute—gravity, the temperature at which ice melts, that commercial goods cost money, that time flows forward but not backward. But the fact that we can take judicial notice of certain indisputable facts does not mean that <u>all</u> facts are indisputable. Predicting the effect of certain kinds of statements on the learning ability of high school students is simply not the kind of "fact" that is judicially noticeable under any fair reading of Federal Rule of Evidence 201. Even the articles that the majority cites admit that the research on these effects is not unanimous. <u>See, e.g.</u>, Lovell, 86 Cal. L. Rev. at 623–24. We have no business assuming without proof that the educational progress of homosexual students would be stunted by Harper's statement.

I find it significant, moreover, that Harper did not thrust his view of homosexuality into the school environment as part of a campaign to demean or embarrass other students. Rather, he was responding to public statements made by others with whom he disagreed. Whatever one might think are the psychological effects of unprovoked demeaning statements by one student against another, the effects may be quite different when they are part of a political give-and-take. By

participating in the Day of Silence activities, homosexual students perforce acknowledge that their status is not universally admired or accepted; the whole point of the Day of Silence, as I understand it, is to dispute views like those characterized by Harper's t-shirt. Supporters of the Day of Silence may prefer to see views such as Harper's channeled into public discourse rather than officially suppressed but whispered behind backs or scribbled on bathroom walls. Confronting—and refuting—such views in a public forum may well empower homosexual students, contributing to their sense of self-esteem.

Beyond the question of evidentiary support, I have considerable difficulty understanding the source and sweep of the novel doctrine the majority announces today.[10] Not all statements that demean other students can be banned by schools;

---

[10] The majority makes a tepid effort to rely on cases from other circuits, but those cases provide virtually no support. West did not purport to announce a generalized right to be left alone that includes the right not to hear viewpoints one finds uncomfortable. See West, 206 F.3d at 1366. The school board in West confronted a long history of racial strife and banned certain political symbols on both sides of the controversy. See id. at 1361–63. West was not a case about psychic damage but about physical security, and whatever stray comments the majority today has plucked out of West are more in the nature of loose language than a holding, or even dicta.

Sypniewski v. Warren Hills Regional Board of Education, 307 F.3d 243 (3d Cir. 2002), on which the majority also relies, involved a school district with a history of racial strife. Even there, the court upheld the policy prohibiting racial "abuse and intimidat[ion]" only insofar as it amounted to bullying. Id. at 264. It

(continued...)

the majority is very clear about this. <u>See</u> maj. op. at 29–30 & n.27. The new doctrine applies only to statements that demean students based on their "minority status such as race, religion, and sexual orientation." <u>Id.</u> at 31–32.[11] Is this a right created by state law? By federal law? By common law? And if interference with the learning process is the keystone to the new right, how come it's limited to those characteristics that are associated with minority status? Students may well have

---

[10](...continued)

emphasized, however, that mere name-calling is protected, and found the policy overbroad insofar as the statements in question merely generated ill will against a student on account of race: "But by itself, an idea's generating ill will is not a sufficient basis for suppressing its expression. 'The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected.'" <u>Id.</u> at 264–65 (quoting <u>R.A.V.</u>, 505 U.S. at 414). Finally, <u>Saxe</u>, which the majority dismisses in a brief footnote, <u>see</u> maj. op. at 24 n.21, cuts entirely the other way, for reasons I explain elsewhere, <u>see</u> pp. 30–33 <u>infra</u>.

[11] The majority equivocates a bit on this point. At one place it states that "[p]ublic school students who may be injured by verbal assaults on the basis of a core identifying characteristic such as race, religion, or sexual orientation, have a right to be free from such attacks while on school campuses." <u>Id.</u> at 20. Read broadly, this would protect students from being disparaged based on any characteristic that two of my colleagues consider to be "core." Presumably this could include race, nationality, sex, weight class, hair color and religion—but not political affiliation. <u>See id.</u> at 30. Next, the majority notes that "schools may prohibit the wearing of T-shirts on high school campuses and in high school classes that flaunt demeaning slogans, phrases or aphorisms relating to a core characteristic of <u>particularly vulnerable</u> students and that may cause them significant injury." <u>Id.</u> at 29 (emphasis added). Later on, however, the opinion limits the new doctrine to core minority characteristics. <u>See id.</u> at 30 n.27. I read the majority's last formulation to be the one it intends, else my colleagues would pretty much have ripped the heart out of <u>Tinker</u>.

their self-esteem bruised by being demeaned for being white or Christian, or having bad acne or weight problems, or being poor or stupid or any one of the infinite number of characteristics that will not qualify them for minority status. Under the rule the majority announces today, schools would be able to ban t-shirts with pictures of Mohammed wearing a bomb turban but not those with pictures of a Crucifix dipped in urine—yet Muslim and Christian children, respectively, may have their learning equally disrupted.

Even the concept of minority status is not free from doubt. In defining what is a minority—and hence protected—do we look to the national community, the state, the locality or the school? In a school that has 60 percent black students and 40 percent white students, will the school be able to ban t-shirts with anti-black racist messages but not those with anti-white racist messages, or vice versa? Must a Salt Lake City high school prohibit or permit Big Love t-shirts?

And at what level of generality do we define a minority group? If the Pope speaks out against gay marriage, can gay students wear to school t-shirts saying "Catholics Are Bigots," or will they be demeaning the core characteristic of a religious minority? And, are Catholics part of a monolithic Christian majority, or a minority sect that has endured centuries of discrimination in America? See maj. op. at 27 n.26.

Finally, I have considerable difficulty with giving school authorities the power to decide that only one side of a controversial topic may be discussed in the school environment because the opposing point of view is too extreme or demeaning. As Judge Gilman said in his persuasive dissent in Boroff v. Van Wert City Board of Education, 220 F.3d 465 (6th Cir. 2000), "school officials are not free to decide that only one side of a topic is open for discussion because the other side is too repugnant or demoralizing to listen to." Id. at 474 (Gilman, J., dissenting) (citing Tinker, 393 U.S. at 508). I couldn't have said it better.

The fundamental problem with the majority's approach is that it has no anchor anywhere in the record or in the law. It is entirely a judicial creation, hatched to deal with the situation before us, but likely to cause innumerable problems in the future. Respectfully, I cannot go along.

### The Harassment Policy

I believe we must also address Harper's claim that he is entitled to an injunction against the school's harassment policy on grounds of substantial overbreadth. Harper raised this claim in the district court, see Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction at 14–16, but the district judge did not decide it in his otherwise thorough opinion.

Harper again raises this claim in his brief before us, and the defendants respond in their brief, yet the majority also fails to decide it. The majority suggests in a footnote that it need not consider whether the school's harassment policy is overbroad because it upholds the school's banning of Harper's t-shirt regardless of the policy. Maj. op. at 13 n.11. The policy, however, covers much more than the particular t-shirt Harper wore on the day in question. Given that the majority has effectively upheld the school's banning of that shirt, it becomes even more important for us to rule on whether and how Harper may express his views in the future.[12] To the extent that the harassment policy limits the ways in which Harper

[12] The majority also seems to say that Harper limited his prayer for relief to the wearing of the shirt, but this is plainly not so. In his motion for a preliminary injunction, Harper moves the district court

> for a preliminary injunction prohibiting Defendants from continuing their violation of the constitutional rights of Plaintiff Tyler Chase Harper. Unless such injunction issues, Chase will continue to suffer irreparable harm to his free speech right to speak out on matters at school in a nondisruptive manner, even if they are perceived by others as "negative" or "derogatory."

In his Memorandum of Points and Authorities in Support of the Motion, Harper expressly challenges the school's Harassment Policy as a whole on overbreadth grounds. See Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction 14–16.

Finally, the majority declines to address the overbreadth argument on the ground that the district judge didn't believe it was before him. See maj. op. at 13

(continued...)

may express himself by means <u>other</u> than his t-shirt, he is surely entitled to a ruling as to whether the district court erred in failing to enjoin the policy.

**1.** The school's harassment policy is contained in several documents. One of these is titled "Student Guide to Understanding and Avoiding Harassment" and contains a list of "actions [that] are prohibited for both students and staff." One such prohibited item is "[n]egative comments or behavior based on race, ethnicity, sexual orientation, religion, or gender." Another publication, addressed to parents, titled "Poway Unified School District Policies & Procedures for Parents Concerning Harassment of Students" contains the following admonition: "SPECIFIC HARASSMENT BEHAVIORS THAT ARE NOT TOLERATED IN THE <u>POWAY UNIFIED SCHOOL DISTRICT</u> INCLUDE," which is followed by a number of items, among them "[n]egative comments, slurs, or behaviors based on race, ethnicity, sexual orientation, religion, or gender."

A document titled "Poway Unified School District Administrative Procedure," dated July 28, 1997, and subtitled "Hate Behavior," contains the

---

[12](...continued)
n.11. But if Harper properly presented the issue—and I have no doubt he did—he is entitled to a ruling, even if we have to address the issue in the first instance. Were a district judge's failure to rule on an issue dispositive, district judges could bury a party's claims simply by ignoring them.

following definition:

> A hate behavior is any act or attempted act to cause physical injury, emotional suffering, or property damage through intimidation, harassment, racial/ethnic slurs and bigoted epithets, vandalism, force or the threat of force, motivated all or in part by hostility to the victim's real or perceived gender, race, ethnicity, religion, sexual orientation, or mental or physical challenges.

The same document contains a heading titled "Examples of Hate Behavior," which is followed by a "list provid[ing] examples of hate behavior to assist identifying where and when it may exist." Among the items listed are the following:

2. The presence of symbols or words considered offensive to persons of a specific gender, race, ethnicity, religion, sexual orientation, or the mentally or physically challenged, such as graffiti, slurs, or painted swastikas.

3. Activities historically associated with threats to persons of a specific gender, race, ethnicity, religion, sexual orientation, or the mentally or physically challenged (e.g., burning crosses, wearing swastikas or white sheets, flying confederate flags, hanging effigies, defacing pink triangles).

. . . .

6. Victim belief that the incident was motivated by bias against him/her as a member of a specific gender, race, ethnicity, religion, sexual orientation, or mentally or physically challenged group.

7. Perpetrator explanation/defense of incident involves exalting own gender, race, ethnicity, religion, sexual orientation, or

mental or physical status and/or includes statements demeaning victim group.

Finally, the lengthy Poway High School Student Handbook contains detailed regulations as to every aspect of student life. Among the many items listed is a dress code:

> Dress: School clothing should be neat, clean, and appropriate for school activities and should follow the standards of common decency. The dress code will be enforced at all school-sponsored activities. Clothing that violates this standard is unacceptable, and the student in violation will be disciplined appropriately.

Examples of unacceptable dress include "[c]lothing and accessories (including backpacks) that promote or portray . . . [v]iolence or hate behavior including derogatory connotations directed toward sexual identity."

Under the heading "Rules of Student Discipline," there is a long list of prohibited acts, including "Sexual harassment" and "Hate behavior/Violence." The list is both preceded and followed with the admonition that:

> A student will be subject to disciplinary action for the designated acts that are related to school activity and attendance and which occur at any time, including but not limited to any of the following:
>
> • The student is on school grounds at a time when school is in session or a school-sponsored activity is in progress
>
> • The student is going to or coming from school
>
> • The student is on break or lunch periods whether on or off campus

• The student is going to, coming from or attending a school-sponsored activity.

Following this list, are a series of definitions, among them the following:

Discrimination:  Discrimination is negative or unfair treatment toward an individual based on race, ethnicity, sexual orientation, religion or gender.  It is against the rules for students to make nasty remarks that embarrass others or make them feel uncomfortable with actions or remarks that are sexual or racial in nature.

Harassment:  Harassment is unwanted and unwelcome behavior from other students or staff members that interferes with another individual's life.  When it is sexual in nature, it is "sexual harassment".  When it is racial in nature, it is "hate motivated behavior" or sometimes a "hate crime".

Hate Behavior:  Negative behaviors that target members of a particular gender, race, ethnicity, religion, sexual orientation, or the mentally or physically challenged will not be tolerated.  Such behaviors may include, but are not limited to:

1. Name calling, racial slurs or bigoted epithets.

2. The presence of symbols or words considered offensive to persons of a specific gender, race, ethnicity, religion, sexual orientation or the mentally or physically challenged, such as graffiti, slurs or painted swastikas.

3. Activities historically associated with threats to persons of a specific gender, race, ethnicity, religion, sexual orientation or the mentally or physically challenged (e.g., burning crosses, wearing swastikas or white sheets, flying confederate flags, hanging effigies, defacing pink

triangles).

4. The posting or circulation of demeaning jokes or caricatures, based on negative stereotypes of a specific gender, race, ethnicity, nationality, religion, sexual orientation or mental or physical challenges.

5. The defacing, removal, or destruction of posted materials, meeting places, memorials, etc. associated with specific gender, race, ethnic, religious, sexual orientation or mental or physical challenges.

6. Victim belief that the incident was motivated by bias against him/her as a member of a specific gender, racial, ethnic, religious, sexual orientation or mentally or physically challenged group.

7. Perpetrator explanation/defense of incident involves exalting own gender, race, ethnicity, religion, sexual orientation or mental or physical status and/or includes statements demeaning victim group.

8. The presence of organized hate group literature and/or posters or reference to an organized hate group.

While the parties provide little guidance about how to navigate these not entirely consistent documents, the most plausible way is to treat the two bulletins distributed to parents and students respectively as informal guidance intended to give a summary of the purpose and effect of the formal rules. The Administrative

Procedure appears to be internal guidance from the school board to school district employees as to the proper way to interpret the formal rules. It is the Student Handbook—the lengthy and detailed set of regulations applicable to Poway High School—that contains the binding rules, the violation of which may result in discipline. It is to these regulations, then, that we must look in determining the scope of the school's anti-harassment policy; the remaining three documents can serve merely as guidance in interpreting the regulations.

**2.** The school's harassment policy seems to prohibit any student speech, whether it be in the classroom, elsewhere on campus, in connection with any school activity, going to and returning from school and quite possibly at all other times and places, if it is derogatory, intended to be derogatory or believed to be derogatory of other students based on certain characteristics—race, ethnicity, sexual orientation, religion, sex or disability. The prohibition extends to jokes or caricatures "based on negative stereotypes," wearing of clothing that portrays "derogatory connotations directed toward sexual identity," name-calling, anything that someone who is a member of one of the protected categories believes was directed against him on account of his status, and any statement by the speaker that exalts his own status in comparison to that of others. The Student Guide to

Understanding and Avoiding Harassment seems to summarize the policy fairly accurately when it explains that "[n]egative comments or behavior based on race, ethnicity, sexual orientation, religion, or gender" are prohibited. That is pretty much the position taken by Principal Fisher in his declaration: "It is my stance that any shirt which is worn on campus which speaks in a derogatory manner towards an individual or group of individuals is not healthy for young people and in violation of school policy." Fisher decl. at 3.

So interpreted, the school's harassment policy is substantially overbroad, largely for the reasons articulated by the Third Circuit in Saxe v. State College Area School District, 240 F.3d 200 (3d Cir. 2001). The policy here, like that in Saxe, is not limited to speech that is vulgar, as defined by Fraser, or likely to cause substantial disruption under Tinker. Also, as in Saxe, the policy here is not limited to offensive speech that is severe and pervasive, so that the prohibition might be approved under our emerging harassment law jurisprudence. See id. at 217. Rather, the policy prohibits pretty much any speech that any student who is a member of one of the protected groups might take umbrage at.

The policy here is, in fact, much broader than that in Saxe in several important respects. First, the policy in Saxe seems to have been limited to school premises; the Saxe court, at least, treated it as such, noting that if the policy were to

cover speech outside of school, it would raise additional constitutional problems. Id. at 216 & n.11. By contrast, the policy here expressly applies outside school premises, extending to off-campus school activities and to travel to and from school. Moreover, the policy expressly states that it may apply elsewhere as well. The policy's vast and uncertain geographic sweep makes it even more important that its substantive terms be narrowed down and precisely defined, consistent with the First Amendment.

Second, the policy in Saxe was found to be overbroad because it prohibited not merely speech that was actually disruptive, but also speech that had the purpose of disrupting, regardless of whether actual disruption occurred. Id. at 216. The policy here says relatively little about disruption, whether intended or actual. Rather, it prohibits much speech merely because of its "derogatory connotations" or because it "interferes with another individual's life." Assuming that a person of ordinary intelligence could even understand what these vacuous phrases mean, the policy here covers vastly more territory than permissible under Tinker.

Third, the policy in Saxe at least attempted to apply some sort of objective definition of what might be deemed offensive or intimidating. Id. at 215 ("[H]arassment under the Policy 'can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of

any of the characteristics described above.'"). By contrast, the policy here focuses expressly on what the individual who believes himself to be the target of the speech believes was the motivation of the speaker. Given the propensity of individuals, particularly adolescents, to view themselves as the center of the universe, this strikes me as a particularly broad and chilling aspect of the policy. See Sypniewski, 307 F.3d at 268–69 ("When policies focus broadly on listeners' reactions, without providing a basis for limiting application to disruptive expression, they are likely to cover a substantial amount of protected speech."). After all, who among us has never made what he thought was an innocuous remark only to learn that somebody else took it as maliciously pointed at them?

Fourth, the policy here, unlike that in Saxe, covers much of what lies at the core of political and symbolic speech, such as the presence or defacing of political symbols, hanging of effigies, flying of flags, etc. I do not dispute that a school can ban certain political symbols based on experience indicating that those symbols may lead to serious disruption or violence. See Sypniewski, 307 F.3d at 257–58; West, 206 F.3d at 1366. But the wholesale banning of the Stars and Bars, swastikas and the like, without any showing of past disruption or likelihood of future disruption, simply to spare the feelings of students who might be offended

by them, strikes me as constitutionally impermissible.[13]  As the Saxe court noted, "[t]he Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it."  Saxe, 240 F.3d at 215 (citing cases).

Last but not least, the policy here (unlike that in Saxe) prohibits not only speech that denigrates others, but also any speech that the student seeks to justify by expressing pride in his own traits.  We are taught to take pride in who we are; it is, in a sense, the American way.  It seems particularly chilling to free expression to restrain speech that expresses pride in one's own religion, ethnicity, sexual orientation, etc.

The problems posed by the policy here, not only for Harper but for many other students, are not theoretical or trivial.  Assuming, as we must, that on the next Day of Silence Harper will not be allowed to wear a t-shirt expressing his interpretation of Romans 1:27, what exactly can he say or wear?  Would a t-shirt

---

[13]  There is language in the imprecisely written opinion in Muller v. Jefferson Lighthouse School, 98 F.3d 1530 (7th Cir. 1996), suggesting that a school could restrict "speech that could crush a child's sense of self-worth."  Id. at 1539–40.  Muller involved elementary-school children and probably the best way to read this phrase is as adapting the Tinker-Fraser standard to younger children.  Only Judge Rovner's concurrence is entirely clear on this point.  Id. at 1546–47 (Rovner, J., concurring).

quoting Romans 1:27[14] be permissible, or is it prohibited because a homosexual student might interpret it as "motivated by bias against him/her"? How about a t-shirt with the message "Straight and Proud of It"? Is this a protected "positive" message, or is it the dreaded "exalting own . . . sexual orientation" and therefore hate behavior? Indeed, is there anything at all that Harper and others of his view can say or do to distance themselves from the Day of Silence proceedings without running the risk that another student will take it personally? May Harper have a discussion at lunchtime where he says: "Homosexuality is sinful"? On his way home from school, may he tell another student a joke disparaging the movie Brokeback Mountain? Once he gets home, can he post criticism of the Day of Silence on his MySpace page? Given the broad language of the policy, I believe any and all of these could be punished by the school authorities as hate behavior.

Nor is Harper alone. Consider those who participate in the Day of Silence. They, of course, believe they are doing so to promote tolerance and equality. But others—like Harper—might view it as an effort to exalt homosexuality and denigrate their own sexual orientation and religious beliefs. Relying on the same

---

[14] "And likewise also the men, leaving the natural use of the woman, burned in their lust one toward another; men with men working that which is unseemly, and receiving in themselves that recompence of their error which was meet." Romans 1:27 (King James).

overbroad policy that the school used to ban Harper's t-shirt, the school could, if it chose, easily ban the Day of Silence activities as demeaning the sexual orientation of straight students, or the religious beliefs of Christians like Harper.

All manner of other speech, from the innocuous to the laudable, could also be banned or punished under the school's hate speech policy. May a student wear a Black Pride t-shirt, or does this denigrate white and Asian students? May a student wear a t-shirt saying "I love Jesus," or will this make Jews, Muslims and Druids feel it's an attack on their religions? May a student wear a t-shirt saying "Proud to be a Turk," or will this cause bad vibrations for the Greeks and Armenians in the school? Will a student be disciplined for disruption if, during a lunch-time discussion, he argues forcefully that the State of Israel oppresses Palestinians and, when called on it, defends himself, saying: "I said it because I'm proud to be a Muslim."?

The types of speech that could be banned by the school authorities under the Poway High School hate policy are practically without limit. Any speech code that has at its heart avoiding offense to others gives anyone with a thin skin a heckler's veto—something the Supreme Court has not approved in the past. See, e.g., Reno v. ACLU, 521 U.S. 844, 880 (1997); Forsyth County v. Nationalist Movement, 505 U.S. 123, 134 (1992); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55–56

(1988). If the policy in <u>Saxe</u> was enjoined as overbroad, the policy here must be enjoined as well.[15]

## Conclusion

Because the <u>only</u> disputed issue before us is likelihood of success on the merits, I believe we have no choice but to reverse. I think it is highly likely that Harper will succeed on his t-shirt claim, and I have no doubt he will succeed as to his overbreadth challenge.

That having been said, I acknowledge that the school authorities here found themselves in a difficult situation and, in light of the circumstances, acted well. Harper was not disciplined for wearing his t-shirt; the school authorities merely tried to diffuse what they saw as a volatile situation.

I also have sympathy for defendants' position that students in school are a captive audience and should not be forced to endure speech that they find offensive and demeaning. There is surely something to the notion that a Jewish student might not be able to devote his full attention to school activities if the fellow in the seat next to him is wearing a t-shirt with the message "Hitler Had the Right Idea"

---

[15]   Insofar as <u>West</u> v. <u>Derby Unified School District No. 260</u> reaches a contrary conclusion on this issue—as I'm afraid it probably does, <u>see</u> 206 F.3d at 1367–68—I must respectfully disagree with my Tenth Circuit colleagues.

in front and "Let's Finish the Job!" on the back. This t-shirt may well interfere with the educational experience even if the two students never come to blows or even have words about it.

Perhaps school authorities should have greater latitude to control student speech than allowed them by Justice Fortas's Vietnam-era opinion in <u>Tinker</u>. Perhaps Justice Black's concerns, expressed in his <u>Tinker</u> dissent, <u>see</u> <u>Tinker</u>, 393 U.S. at 524–26 (Black, J., dissenting), should have been given more weight, <u>see</u> <u>Karp</u>, 477 F.2d at 174. Perhaps the narrow exceptions of <u>Tinker</u> should be broadened and multiplied. Perhaps <u>Tinker</u> should be overruled. But that is a job for the Supreme Court, not for us. <u>See</u> <u>Boroff</u>, 220 F.3d at 475 (Gilman, J., dissenting). While I sympathize with my colleagues' effort to tinker with the law in this area, I am not convinced we have the authority to do so, which is why I must respectfully dissent.